FILED IN THE
U.S. DISTRICT COURT
EASTERN DISTRICT OF WASHINGTON

Jun 15, 2021

SEAN F. McAVOY, CLERK

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF WASHINGTON

| | |
|---|---|
| RUSSELL JONES and REINA JONES, a married couple, <br><br> Plaintiffs, <br><br> v. <br><br> GRANT COUNTY HOSPITAL DIST. NO. 1 d/b/a/ SAMARITAN HOSPITAL, a Washington Municipality, <br><br> Defendant. | NO. 2:19-CV-00264-SAB <br><br><br> **ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT** |

Before the Court is Defendant's Motion for Summary Judgment, ECF No. 107. The motion was heard without oral argument.[1] Plaintiffs are represented by Ryan Best and Jacob Mark. Defendant are represented by Amy Mensik and Sawyer Margett.

### Introduction

Plaintiffs Russell Jones and Reina Jones are bringing employment discrimination claims against Mr. Jones' former employer, Defendant Samaritan Hospital. Plaintiffs assert that Mr. Jones was terminated because of his sex and age and because he requested accommodations for his hearing loss and filed an EEOC

---

[1] The Court has determined that oral argument was not necessary.

**ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT ~ 1**

charge and because of his gender and age. Defendant asserts Mr. Jones was terminated for inappropriate conduct.

### Motion Standard

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). There is no genuine issue for trial unless there is sufficient evidence favoring the non-moving party for a jury to return a verdict in that party's favor. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986). The moving party has the initial burden of showing the absence of a genuine issue of fact for trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986). If the moving party meets its initial burden, the non-moving party must go beyond the pleadings and "set forth specific facts showing that there is a genuine issue for trial." *Anderson*, 477 U.S. at 248.

In addition to showing there are no questions of material fact, the moving party must also show it is entitled to judgment as a matter of law. *Smith v. Univ. of Wash. Law Sch.*, 233 F.3d 1188, 1193 (9th Cir. 2000). The moving party is entitled to judgment as a matter of law when the non-moving party fails to make a sufficient showing on an essential element of a claim on which the non-moving party has the burden of proof. *Celotex*, 477 U.S. at 323. The non-moving party cannot rely on conclusory allegations alone to create an issue of material fact. *Hansen v. United States*, 7 F.3d 137, 138 (9th Cir. 1993).

When considering a motion for summary judgment, a court may neither weigh the evidence nor assess credibility; instead, "the evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." *Anderson*, 477 U.S. at 255.

### Facts

The record submitted by the parties is voluminous. For the Court's benefit, the parties prepared Statement of Facts that have assisted the Court in reviewing

**ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT ~ 2**

the record. ECF Nos. 108, 124, 127, 136. Plaintiffs also provided their Declarations, ECF No. 128, 129.

Plaintiffs' Declarations contain numerous instances of inadmissible, unsupported, and conclusory facts. Additionally, it appears that these Declarations are an attempt to explain or challenge Defendant's facts, rather than presenting Plaintiffs' version of what happened. As a result, the Declarations are less than helpful for the Court in determining whether there are genuine issues of material fact. For instance, in paragraph 24 of Mr. Jones's Declaration, he stated that "[w]ord came to me that Rebecca Suarez wanted me written up for anything and everything to justify my termination." ECF No. 128. Mr. Jones does not provide the details as to how he came to know this. It appears Mr. Jones wants the Court to take this as "fact." It is unable to do so. Additionally, in paragraph 28, Mr. Jones states that a board member of Samaritan told him that he was not being treated fairly. *Id.* Mr. Jones does not identify the board member, and more importantly, does not provide a declaration from this board member that would provide admissible evidence that this fact was true. Similar problems exist for Ms. Jones's Declaration.

Consequently, the Court has taken a critical look at the facts submitted by the parties as presented in the Statement of Facts and will only rely on those facts that would be admissible at trial while reviewing the facts in the light most favorable to Plaintiffs, the non-moving party.

The Court also recognizes there are disputed facts surrounding many of the complaints reportedly received by Defendant regarding Plaintiffs' conduct. Additionally, Plaintiffs challenge these reports as inadmissible hearsay. The complaints/reports are not hearsay because they are not being offered for the truth of the matter asserted. Rather, the complaints/reports are being offered and considered by the Court to show that Defendant received the complaints, which is relevant to deciding whether Defendant had a legitimate, nondiscriminatory reason

**ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT ~ 3**

for the actions it took. Notably, Plaintiffs have not disputed that Defendant received the complaints. Rather, they dispute whether the allegations in the complaints were true. The Court recognizes that it is not its role to resolve these questions of fact. However, the Court does need to consider whether Defendant received the complaints and whether it honestly believed these reports to be the basis for its actions. *See Villiarimo v. Aloha Island Air, Inc.*, 281 F.3d 1054, 1063 (9th Cir. 2002) (noting that courts "only require that an employer honestly believed its reasons for its actions, even if its reason is 'foolish or trivial or even baseless.'") Because Plaintiffs have not challenged the fact that the complaints/reports were made or that Defendant received the complaints/ reports they are set forth in the Court's recitation of the facts. The Court takes no position as to whether the allegations in the complaints/reports are true or false.

Plaintiff Russell Jones is an Advanced Registered Nurse Practitioner (ARNP) who began working in Defendants' Emergency Department (ED) in July 2017. Prior to that, he worked as an ARNP in Texas. He has been a nurse since 1991. Mr. Jones was terminated on April 5, 2019, after Defendant received a complaint from a patient regarding the care he received from Mr. Jones.

Mr. Jones has significant hearing loss and wears hearing aids. When he interviewed from the job with Defendant in February 2017, he was assured by Becky DeMers, Defendant's Chief Nursing Officer, that Defendant would talk to the other nurses about his hearing loss and tell the charge nurses and staff that when he is loud, he is not being mean; rather, it was part of his disability. He was also told that Defendant would hire his wife, Plaintiff Reina Jones, as an ED nurse. After the interview, Defendant offered the job to Mr. Jones. He was 57 years old at the time of the interview. Ms. Jones was hired in October 2017.

Mr. Jones was happy working for Defendant for the first eight months. However, Defendant began receiving reports from the nursing staff that Mr. Jones

**ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT ~ 4**

resisted seeing Flex Care patients.[2] Plaintiffs dispute that Mr. Jones resisted seeing Flex Care patients but do not dispute that Defendant received such reports. Plaintiffs believe the reports stemmed from Rebecca Suarez's frustration that she had to hire Ms. Jones. Defendant held a staff meeting sometime prior to March 9, 2018 to discuss process improvement for Flex Care. At the meeting, Mr. Jones became angry and defensive, stating "You will not dictate who I see first" while slamming his hand on the conference room table.

On March 9, 2018, Ms. Suarez emailed Ms. DeMers detailing complaints that she had received about Mr. Jones' behavior in the ED. On March 13, 2018, Mr. Jones met with Ms. DeMers and explained that he and his wife Reina recently had a fight, and he had been arrested for domestic violence-related reasons.

On March 14, 2018, Ms. Suarez received a report from Ms. Gloria Robbins, the charge RN, that Mr. Jones yelled at another nurse, Cortney Koehn, and otherwise acted unprofessionally by sarcastically "apologizing" and "bowing." Mr.

---

[2] In 2017, Defendant started a "fast track" or "Flex Care" area in its ED. This is an area and process in the ED that addresses patients with lower acuity (*i.e.*, less critical) needs. The purpose of Flex Care is to provide a process to assess, examine and treat patients with less-critical care needs safely and efficiently, so that the main ED room resources, including limited rooms and medical providers, are conserved for more critical patients. In the Flex Care area, for example, patients can be roomed and assessed then returned to the general lobby waiting area while they await x-ray, lab results, etc. In the meantime, another Flex Care patient can be seen and assessed in the open room. At Defendant's hospital, the Flex Care area is outside the main ED area and across the hall next to the ED waiting area/lobby. The "Admitting" area is where ED patients are initially admitted and is the "hub" of the Flex Care area, including where the provider and nurses interact to discuss care for Flex Care patients.

**ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT ~ 5**

Jones maintains that he had not intended to act unprofessionally, but he admits he was frustrated with the situation and he may have been a bit melodramatic. He maintains he intended to make light of the situation. Ms. Suarez contacted Ms. DeMers to let her know what Ms. Robbins reported about the incident. Mr. Jones also texted Ms. DeMers, letting her know he had to raise his voice to get the nurse's attention because the nurse was deeply involved in her conversation, but he did so very politely.

Julie Weisenburg, Chief Human Resources Officer for Defendant, was informed of this incident, and she concluded, based on the various accounts, that Mr. Jones acted inappropriately.

On March 15, 2018, Defendant's care representative, Sherrie Jingling, received a call from a caregiver of a minor teenage female patient who had visited Defendant's ED the day before for a possible concussion. The patient was seen by Mr. Jones. The caregiver told Ms. Jingling that she was present in the visit and was concerned about Mr. Jones's attitude with the patient. She stated Mr. Jones told the patient that she was "B-squared," meaning "Beauty and Brains" and that his statements made the caregiver uncomfortable. The caregiver also relayed that Mr. Jones talked about his "drug seeker" son; did not listen when the patient stated her shoulder hurt; and told them that their x-rays were done sometime ago, but because "there were sick and dying people" in the main ED he "didn't have time" to get back to them for follow up. She stated that Mr. Jones "made them feel stupid for coming to the ER." A report of this incident was given to Ms. DeMers and Ms. Weisenburg.

On March 20, 2018, Kathryn Trumbull, Defendant's Patient Experience Director, reported an incident to Ms. DeMers that Plaintiffs were "patting each other's bottoms while at the nurses' station" while a "code" was going on in the Trauma room. She indicated that this conduct was in full view of a family in the ED and that other staff were running around trying to handle the code.

**ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT ~ 6**

On March 21, 2018, Joe Byrd, Defendant's head of security, spoke with Ms. Suarez and told her that an anonymous ED staff member approached him about Mr. Jones' "potentially aggressive" behavior toward staff in the ED, particularly as to his wife, Reina, including an incident where Plaintiffs had a loud "uncomfortable" discussion over Ms. Jones giving a patient a medication Mr. Jones had cancelled.

Ms. DeMers and Mr. Jones met on April 6, 2018 to discuss the complaints. During the meeting, Plaintiff complained about personal cell phone use amongst the nursing staff. Ms. DeMers agreed to follow up with Ms. Suarez about staff cell phone use.

On April 10, 2018, a "Caught in the Act of Caring Card" had been placed on Ms. Suarez's desk in the ED.[3] The card was changed to "Caught in the Act of Being Rude" and included a complaint about Mr. Jones from a spouse of a patient, stating Mr. Jones had suggested that she had been the source of her husband's urinary tract infection by not following proper hand-washing procedures. The card also stated, "[t]hen Mr. Jones coughed into his hands and touched my husband." Ms. Suarez forwarded this complaint to Ms. DeMers.

On May 5, 2018, Ms. Trumbell received a message from a male patient who had been seen in the ED the day prior. The patient reported that Mr. Jones "treated him badly" and was "rude and disrespectful." Ms. Trumbell reported this incident to Ms. DeMers, and Ms. Weisenburg learned of this complaint as well.

On May 8, 2018, Ms. DeMers learned about an incident that took place on April 24, 2018. Ashley Spies, an ED RN, emailed Ms. Suarez about an incident in which a patient and her husband were upset after Mr. Jones accused the patient of

---

[3] A "Caught in the Act of Caring Card" is a feedback card available throughout the ED that patients, staff, visitors, etc. can fill out.

**ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT ~ 7**

being drug seeking. Ms. Weisenburg learned of this incident no later than May 25, 2018.

On May 18, 2018, Ms. Koehn texted Ms. Suarez regarding an incident in which Ms. Koehn advised her student nurse to not translate for Mr. Jones during a procedure and he was furious at her. Ms. Suarez texted Mr. Jones to let him know that Ms. Koehn was correct pursuant to Defendant's policy. Mr. Jones confronted Ms. Koehn, asking to see the text messages she had sent about the incident and telling her that she "opened a can of worms." Ms. DeMers and Ms. Suarez viewed Mr. Jones's confrontation as potentially inappropriate attempts to intimidate Ms. Koehn for raising concerns about him.

Defendant's management received a report that, on or about May 18, 2018, Mr. Jones had muttered under his breath to a Spanish-speaking mother of a patient something like, "Why don't you know English? You are in America." Ms. Weisenburg learned of this incident no later than May 25, 2018.

On June 7, 2018, Mr. Jones met with Ms. DeMers and Dr. Tran, the Medical Director of the ED. Ms. Demers and Dr. Tran spoke with Plaintiff about his interactions with patients, and counseled him that while he may have strong feelings about patients he perceives as drug seeking, the ED may not be the time to lecture or educate the patient about it. They also instructed that Mr. Jones should not be discussing his personal life with patients.

They discussed Mr. Jones's hearing loss and he asked that he be able to sit in the "MD" spot in the main ED, so he could hear the nurses better. Dr. Tran did not have an issue with his request and indicated there should not be a problem with that change.

Around this same time, a meeting regarding Flex Care was held. It was decided that the ED would experiment with having the Advance Care Practitioner

**ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT ~ 8**

(APC)[4] stationed in the Triage/Flex Care area between 12:00 noon to 12:00 a.m. The goal was to have the APC stay in this area unless the ED physician requested help in the main ER.

After the June 7, 2018 meeting, Defendant continued to receive additional complaints about Mr. Jones's conduct. No later than June 12, 2018, Ms. Suarez received a report that, on or June 3, 2018, Mr. Jones had pushed back on seeing a patient in Flex Care, and then in reference to Dr. Simmons, a female ED physician, said something about the physician "sucking on her mother's tit." Ms. Koehn made a report about this incident. Katie Hammer, ED Health Unit Coordinator, emailed Ms. Suarez and Ms. DeMers about the incident. Ms. DeMers told Ms. Weisenburg about Plaintiff's comment.

Ms. DeMers emailed Mr. Jones notifying him that she had received reports regarding his interaction with the nurses and patients. Plaintiff replied that he was on vacation but was "unaware of any adverse interactions with nursing or patients." The Jones returned from vacation and on July 1, 2018, when neither one was scheduled to work, they went into the ED and "thanked" those co-workers who they believed did not report Mr. Jones about his comment about Dr. Simmons. Mr. Jones said that "I know Cortney has it in for me." Ms. Koehn reported the Jones's visit to the ED the next day to Ms. Suarez, who in turn reported it to Ms. DeMers and Ms. Weisenburg. Ms. Koehn reported that she felt threatened by Mr. Jones and she was "scared to work with him." Ms. Suarez, Ms. DeMers, and Ms. Weisenburg viewed Mr. Jones' conduct as potential retaliation or intimidation of Ms. Koehn.

As a result of this incident, Ms. DeMers and Ms. Weisenburg met with Mr. Jones on July 5, 2018. By July 5, 2018, Defendant had received at least a dozen co-worker and patient complaints about Mr. Jones's conduct. With respect to Mr.

---

[4] Mr. Jones was considered an APC.

**ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT ~ 9**

Jones's comment about Dr. Simmons, he explained that he said "I was saving people's lives when she was nursing on her mother's breast" but agreed that his statement was inappropriate. Mr. Jones also mentioned that the noise from the printers and copiers in the main ED "made his head want to explode" because of his hearing loss. Ms. Weisenburg and Ms. DeMers discussed with Mr. Jones that he was supposed to be sitting in the Flex Care area as part of his responsibilities and this area was away from the printers and copiers. Ms. DeMers' notes reflect that Mr. Jones indicated that the Flex Care arrangement was going better with less noise exposure and "works beautifully."

A follow-up meeting was set for July 10, 2018, which Mr. Jones missed. In the meantime, Ms. Suarez informed Ms. DeMers and Ms. Weisenburg that a number of RNs came by her office concerned about postings that Plaintiffs put on their lockers, including statements such as "prayers" for "enemies," "Father Forgive Them" to "defend us in battle" and "protection" against "wickedness and snares of the devil."

On July 20, 2018, Ms. Weisenburg and Ms. DeMers met with Mr. Jones and issued him a Notice of Corrective Action. The July Corrective Action stated, in part:

> This verbal warning shall serve to confirm disciplinary action regarding professional conduct and courteous communication.
> . . .
> Corrective Action/Replacement Behavior:  We expect you to conduct yourself in a professional and courteous communication at all times. Be professional and respectful of others in all communications, whether face-to-face, by phone, written, or electronic. These changes must be immediate and sustained. Should you fail to make necessary improvements, you will be subject to further disciplinary action up to and including termination.

Penny Mayo, an RN in the ED, reported to Defendant that on or about August 4, 2018, Mr. Jones was judgmental toward a patient who was intoxicated.

**ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT ~ 10**

Mr. Jones refused to give her any pain medication before reducing her ankle fracture because she was intoxicated.

On September 10, 2018, Ms. Weisenburg and Ms. DeMers met with Mr. Jones to find out what happened on August 4, 2018. He explained that he had difficulty treating patients he perceived as under the influence due to losing his parents and a sibling through separate drunk driving accidents.

Ms. Weisenburg then spoke with Penny Mayo on September 26, 2018 about the incident. Consequently, Ms. Weisenburg and Ms. DeMers decided that Mr. Jones should be disciplined for his conduct.

On October 2, 2018, Ms. Weisenburg and Ms. Demers met with Mr. Jones and issued him a "Final Written Warning." It stated, in part:

> Corrective Action/Replacement Behavior: We expect you to conduct yourself in a professional manner which includes professional and courteous communication at all times. Be professional and respectful of others in all communications, whether face-to-face, by phone, written, or electronic. These changes must be immediate and sustained. Should you fail to make necessary improvements, your employment with Samaritan Healthcare will be terminated.

On October 5, 2018, Mr. Jones filed a Complaint with the Equal Employment Opportunity Commission and the Washington State Human Rights Commission. He indicated he was being discriminated against on the basis of sex, age, disability, retaliation, and was experiencing a hostile work environment. Specifically, he indicated he was being discriminated against based on his hearing loss. He stated that he had requested to be seated away from his regular desk which is adjacent to four copy machines that are very noisy, but his employer only sometimes accommodated his request.

According to Plaintiffs, the harassment claim was based on five topics: (1) colleagues telling Mr. Jones to "turn it up,"(2) "check your batteries," (3) "never mind" (with eye rolling), (4) "lip-syncing" and (5) being "offended" when he

**ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT ~ 11**

asked to see their faces to read lips. Plaintiffs also assert that ED nurses Cortney Koehn and Jeni Seitz would press the "call" button in unoccupied patient rooms to initiate the 150 decibel alarm to ring a couple feet from Mr. Jones's good left ear. The nurses would tell him the alarm was in an empty room, and then refused to turn off the alarms. He would have to turn the alarm off himself, and the nurses would laugh. He maintains that the nurses would trigger alarms, lip synch when talking to him, purposely talk in low voices, but also yell at him. He maintains that this behavior increased as he was getting written up.

On April 13, 2019, Mr. Jones emailed an investigator at the EEOC, stating that "there has been a few significant changes. My work had improved significantly after consulting an attorney. All complaints, harassments, had all but ceased and I was able to reestablish a good working relationship with the ED staff. I was prepared to cancel the EEOC proceedings."

On March 1, 2019, Jeni Seitz reported to Ms. Suarez that she had a number of concerns regarding Mr. Jones that occurred on February 24, 2019. She reported that Mr. Jones cared for four patients and was "very rude to each causing each patient to either cry, leave [against medical advice] and cuss and scream at rest of staff." She relayed an incident where Mr. Jones was rude to his wife, Ms. Jones. She added that she felt the ED was a hostile work environment and staff walked on eggshells around the Jones.

Ms. Suarez called the patients that Ms. Seitz identified in her report. One patient said that Mr. Jones was "rude from the beginning" and was "not compassionate." Another caregiver said that Mr. Jones showed no compassion toward her father, who was a patient. Ms. Suarez reported her conversations to Ms. Weisenburg by March 6, 2019.

On March 14, 2019, Ms. Suarez sent an email to Becky DeMers and Julie Weinburg about a report by a staff member who wanted to remain anonymous. The staff member stated that on March 10, 2019, Mr. Jones grabbed her ponytail and

**ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT ~ 12**

said, "in grade school when little boys would pull little girls' ponytails it means they like them, what do you think it means now?" She reported a second incident where she had made a comment about a particular nurse being a black cloud because it is always busy when she is triage RN, and Mr. Jones stated in response, "Or somebody is saying there is a really hot nurse out here wanna come and see her, she's been doing a really good job in triage." Finally, she reported that Mr. Jones told her that "he slept naked" and made statements about another staff member that "she has a really nice mouth."

On March 18, 2019, Ms. Weinsenburg was forwarded a Facebook message from Defendant's internal Facebook page that stated:

> We are horrified at the behavior of an Er doctor. Dr. Russell [Mr. Jones] has no tact and says inappropriate things. We have had him on a few occasions and he is disgusting. My husband was there tonight for some bleeding. He told him he was going to peek at his bottom. No warning at all that he was going to stick his fingers up there to check. It was horribly painful and we were shocked as he could see the discomfort and told my husband to lift his leg over. He then proceeded to tell us about his experience back east and how some of the guys would move closer to him. My husband actually told him no when he realized what he was doing and he didn't stop.
>
> My husband actually told him he was done and wanted to leave and he ignored him and just kept telling his disgusting stories!
>
> My husband actually told him you just fucking raped me and the dr didn't say anything and walked out.

On March 19, 2019, Ms. Trumbull and Kurt Kuykendall, Defendant's Director of Quality and Risk Management, called the patient's spouse who had sent the Facebook message. She confirmed her account of the incident and also relayed that her 17-year-old son had been seen by Mr. Jones in January, and during the visit Mr. Jones told stories to her son about a nurse that was really "hot," but that he was married so he had to be careful. Later that day, Ms. Weisenburg, Ms.

**ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT ~ 13**

Trumbull and Mr. Kuykendall also spoke with the patient.

Mr. Jones was put on administrative leave on March 20, 2019. In investigating the claim, Defendant noted that Mr. Jones had charted 14 of his 15 patient encounters that evening, but he did not chart for the patient who complained of the incident above.

On March 28, 2019, Ms. Weisenburg and Ms. DeMers met with Mr. Jones regarding the incident. He generally denied the allegations.

On April 5, 2019, Ms. Weisenburg terminated Mr. Jones' employment via letter stating: "in light of the severity of the incident, and your prior disciplinary infractions and performance deficiencies, your employment with [Defendant] is terminated effective today, April 5th."

On April 23, 2019, Ms. Weisenburg submitted a Healthcare Provider Complaint Form to the Washington Department of Health, regarding the incident that occurred on March 19, 2019 because of the sexual nature of the encounter.

On August 6, 2019, Mr. Jones filled out an Equal Employment Opportunity Questionnaire against Defendant. In this Form, Plaintiff identified the discriminatory action as his "[t]ermination in retaliation for filing a pervious EEOC Complaint." The formal EEOC Charge of Discrimination, which was signed by Plaintiff on August 30, 2019, states that the latest dates that discrimination took place was April 5, 2019. He indicated that he requested to be seated away from the four noisy copiers, and that his employer agreed with the request "indicating there was no 'required' seating arrangements."

Plaintiffs assert the timing of his termination coincides with him signing a contract with Sound Physicians. They believe that Defendant wanted to terminate Mr. Jones prior to April 15, 2019, because after that date, they would not have the authority to do so since he would be working for Sound Physicians.

//

//

**ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT** ~ 14

**Defendant's Motion for Summary Judgment**

Defendant makes the following arguments in support of its Motion for Summary Judgment: (1) Mr. Jones failed to exhaust any post-October 2018 Title VII claims and claims based on Defendant's report to the State; (2) the filing of the report to the Washington Department of Health is speech activity immune from suit under the *Noerr-Pennington* doctrine; (3) Plaintiffs' disparate treatment claim fails because they cannot show that Mr. Jones was performing his job satisfactorily and cannot establish a prima facie case of causation; (4) Plaintiffs' retaliation claims fail because of the timing of the charge, the fact that his termination was based on subsequent conduct, reports, and complaints, and the fact that he cannot show by "specific and substantial" evidence that Defendant did not "honestly believe" the reasons for terminating him or that patient complaints, prior disciplinary actions and performance deficiencies were pretext to retaliate for his prior EEOC charge that was filed six months later; (5) Plaintiffs' failure to accommodate claim fails because they cannot show Mr. Jones was qualified for his ARNP role because he was not performing his job anywhere near "satisfactorily," regardless of his hearing loss, given the many complaints against him and his disciplinary history and regardless, Defendant granted his accommodation requests. Defendant also argues that Plaintiffs cannot show that Mr. Jones's request for accommodation was a "but for" cause of his termination; and (6) Plaintiffs did not exhaust any alleged age and gender-based harassment claim; the record suggests that Plaintiffs' reasons that their co-workers did not like Mr. Jones are non-protected reasons; any alleged harassment that presumably was but-for his hearing loss was not severe or pervasive; and as soon as Defendant was aware of Mr. Jones's complaint, it took remedial action and the harassment discontinued.

//

//

//

**ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT** ~ 15

## Analysis

### 1.    Failure to Exhaust

Title VII requires claimants to file a charge of discrimination with the EEOC prior to filing a lawsuit against the employer. 42 U.S.C. § 2000e-5(e). "Title VII's charge-filing requirement is a processing rule, albeit a mandatory one, not a jurisdictional prescription delineating the adjudicatory authority of the courts." *Fort Bend Cty, Texas v. Davis*, __ U.S. __, 139 S.Ct. 1843, 1851 (2019).

The scope of the plaintiff's court action depends on the scope of the EEOC charge and investigation. *EEOC v. Farmer Bros. Co.*, 31 F.3d 891, 899 (9th Cir. 1994); *Sosa v. Hiraoka,* 920 F.2d 1451, 1456 (9th Cir. 1990). The specific claims made in district court ordinarily must be presented to the EEOC. *Albano v. Schering–Plough Corp.*, 912 F.2d 384, 385 (9th Cir. 1990). However, any charges of discrimination that are (1) "like or reasonably related to" the allegations made before the EEOC, and/or (2) charges that are within the scope of an EEOC investigation that reasonably could be expected to grow out of the allegations may be considered by the district court. *Sosa*, 920 F.2d at 1456. The reasoning behind this is that if closely related incidents occur after a charge has been filed, additional investigative and conciliative efforts would be redundant. *Brown v. Puget Sound Elec. Apprenticeship & Training Trust*, 732 F.2d 726, 729-30 (9th Cir. 1984). On the other hand, "[w]here claims are not so closely related that agency action would be redundant, the EEOC must be afforded an opportunity to consider disputes before federal suits are initiated. Bypassing the administrative process under such circumstances frustrates the policy of encouraging informal conciliation and fostering voluntary compliance with Title VII." *Id.*

In analyzing the EEOC charge, the Court must construe the charge liberally. *Sosa*, 920 F.2d at 1456. In determining whether a claim is like or reasonably related to the claim presented to the EEOC the Court considers whether the claim was investigated by the EEOC, and whether such an investigation could not have

**ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT ~ 16**

been reasonably expected to grow out of the plaintiff's charges. *Id.*; *see also Leong v. Potter*, 347 F.3d 1117, 1121 (9th Cir. 2003). Also, the Court needs to consider whether Mr. Jones's charge provided adequate notice of his claims or whether a voluntary settlement of his claim might be possible through reasonable accommodation. *Sosa*, 920 F.2d at 1456.

Here, Plaintiffs failed to exhaust Defendant's filing of the April 23, 2019 report with the Washington Department of Health. Mr. Jones's August 2019 EEOC claim indicated that the latest dates that discrimination took place was April 5, 2019. The August 2019 claim indicated that he was terminated in retaliation for filing an EEOC claim, as well as being discriminated against because of his age, disability, and engagement in protective activity. EEOC would not have know to investigate the filing of the report. Moreover, Mr. Jones's August 2019 EEOC claim fails to indicate that he was terminated because of his sex. Thus, to the extent that Plaintiffs are now making such a claim, they failed to properly exhaust it and it is not properly before the Court.

### 2. *Noerr-Pennington* doctrine

Because the Court finds that Mr. Jones failed to exhaust any claim based on the filing of the report with the Washington Department of Health, the Court need not address whether the *Noerr-Pennington* doctrine provides immunity for the filing of the report.

### 3. **Disparate Treatment Claim**

Plaintiffs are bringing claims for disparate treatment under both Title VII and the Age Discrimination in Employment Act (ADEA).

#### A. Title VII

Under Title VII, an employer may not "discriminate against an individual with respect to his . . . terms, conditions, or privileges of employment" because of his sex. 42 U.S.C. § 2000e-2(a).

**ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT** ~ 17

The legal framework to analyze a motion for summary judgment on a Title VII claim is set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). Under this framework, to survive a motion for summary judgment on a disparate treatment claim under Title VII, Plaintiffs must first establish a prima facie case of discrimination. *Id.* at 802. To do so, Plaintiffs must offer proof that: (1) Mr. Jones belongs to a class of persons protected by Title VII; (2) Mr. Jones performed his job satisfactorily; (3) Mr. Jones suffered an adverse employment action; and (4) Defendant treated Mr. Jones differently than a similarly situated employee who does not belong to the same protected class as he does. *Cornwell v Electra Cent. Credit Union*, 439 F.3d 1018, 1028 (9th Cir. 2006).

If Plaintiffs establish a prima facie case of disparate treatment, the burden of production (but not persuasion) then shifts to Defendant to articulate some legitimate, nondiscriminatory reason for the challenged action. *Id.* at 802. If Defendant does so, Plaintiffs must show that the articulated reason is pretextual "either directly by persuading the court that a discriminatory reason more likely motivated [Defendant] or indirectly by showing that [Defendant's] proffered explanation is unworthy of credence." *Chuang v. Univ. of Calif. Davis*, 225 F.3d 1115, 1123 (9th Cir. 2000) (quotation omitted). Although a plaintiff may rely on circumstantial evidence to show pretext, such evidence must be both specific and substantial. *Villiarimo*, 281 F.3d at 1062.

"In the context of employment discrimination law under Title VII, summary judgment is not appropriate if, based on the evidence in the record, a reasonable jury could conclude by a preponderance of the evidence that the defendant undertook the challenged employment action because of the plaintiff's [protected status]." *Cornwell*, 439 F.3d at 1028.

Here, regardless of whether Mr. Jones was performing his job satisfactorily, Defendant has rebutted any presumption and has amply shown that it terminated Mr. Jones for legitimate, nondiscriminatory reasons and Plaintiffs have failed to

**ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT** ~ 18

show that these reasons are pretext for gender discrimination. The Court finds that a reasonable jury would not conclude by a preponderance of the evidence that Mr. Jones's sex was a motivating factor in Defendant's decision to terminate him. As such, summary judgment on Plaintiffs' Title VII claim is appropriate.

### B. ADEA

The Age Discrimination in Employment Act (ADEA), 29 U.S.C. § 621 *et seq.*, protects workers aged forty or older from employment discrimination on the basis of their age. The ADEA provides, in relevant part, that "[i]t shall be unlawful for an employer ... to fail or refuse to hire or to discharge any individual or otherwise discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's age." 29 U.S.C. § 623(a)(1) (emphasis added). "There is no disparate treatment under the ADEA when the factor motivating the employer is some feature other than the employee's age." *Hazen Paper Co. v. Biggins*, 507 U.S. 604, 609 (1993).

To establish a disparate-treatment claim under the ADEA, a plaintiff must prove that age was the "but-for" cause of the employer's adverse decision. *Gross v. FBL Financial Serv., Inc.*, 557 U.S. 167, 177 (2009). Under the ADEA, then, the burden does not shift to the employer to show that it would have taken the action regardless of age, even when a plaintiff has produced some evidence that age was one motivating factor in that decision. *Id.*

Here, a reasonable jury would not conclude that Defendant discharged Plaintiff because of his age. Notably, Defendant was hired when he was 57 years old. If Defendant had some animus toward older workers, it never would have hired Mr. Jones in the first place. There is nothing in the record that suggest that Mr. Jones's age had anything to do with any disciplinary action or the decision to terminate him.

### 4. Americans With Disabilities Act (ADA) Claim

The Americans With Disabilities Act (ADA) provides that no employer

**ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT ~ 19**

"shall discriminate against a qualified individual on the basis of disability in regard to ... discharge of employees ... and other terms, conditions, and privileges of employment." 42 U.S.C.A. § 12112(a). Thus, under the ADA, an employer may not terminate an employee because of their physical or mental impairment. Additionally, an employer engages in unlawful discrimination under the ADA by "not making reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability[.]" 42 U.S.C. § 12112(b)(5)(A).

To establish an ADA discrimination claim, a plaintiff must show that (1) he is disabled; (2) he is a qualified individual, meaning he can perform the essential functions of her job; and (3) the defendant (a) failed to provide a requested reasonable accommodation, (b) failed to engage in an interactive process where a reasonable accommodation would have been possible, or (c) terminated the plaintiff because of his disability. *Kennedy v. Applause, Inc.*, 90 F.3d 1477, 1481 (9th Cir. 1996); *Sanders v. Arneson Prods., Inc.*, 91 F.3d 1351, 1353 (9th Cir. 1996); *Nunes v. Wal-Mart Stores, Inc.*, 164 F.3d 1243, 1246 (9th Cir. 1999); *Zivkovic v. S. Cal. Edison Co.*, 302 F.3d 1080, 1090 (9th Cir. 2002).

Discrimination claims under the ADA are subject to the burden-shifting *McDonnell Douglas* framework. *Curley v. City of North Las Vegas*, 772 F.3d 629, 632 (9th Cir. 2014). Under this framework, an employee challenging an adverse employment action has the initial burden of establishing a prima facie case of discrimination. *Id.* The burden then shifts to the employer to provide a legitimate, nondiscriminatory, or nonretaliatory reason for the adverse employment action. *Id.* If the employer does so, then the burden shifts back to the employee to prove the reason given by the employer was pretextual. *Id.*

Here, Defendant has rebutted any presumption and has amply shown that it terminated Mr. Jones for legitimate, nondiscriminatory reasons and Plaintiffs have failed to show that these reasons are pretext for disability discrimination. *See id.*

**ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT ~ 20**

(declining to decide whether the plaintiff can establish a prima facie case of discrimination because, even if he could, he failed to raise a genuine issue of material fact as to whether the employer's reasons for terminating him were pretextual).

Also, Plaintiffs have not shown there are questions of material fact regarding whether Defendant failed to provide a requested reasonable accommodation. Rather, the record indicates that Mr. Jones requested and received appropriate accommodations. A reasonable jury would not find that Defendant discriminated against Mr. Jones by failing to provide a reasonable accommodation. As such, summary judgment on Plaintiffs' ADA claims are appropriate.

### 5.    Retaliation Claims

Title VII, the ADEA, and the ADA all prohibit an employer from retaliating against an employee for engaging in protected activity. *See* 42 U.S.C. § 2000e-3(a) (Title VII); 29 U.S.C. § 623(d) (ADEA); 42 U.S.C. § 12203(a) (ADA). Such retaliation claims proceed under the *McDonnell Douglas* burden-shifting framework. *See Pardi v. Kaiser Found. Hosp.,* 389 F.3d 840, 849 (9th Cir. 2004) (ADA retaliation claim); *Hashimoto v. Dalton*, 118 F.3d 671, 680 (9th Cir. 1997) (Title VII retaliation claim); *see also Merrick v. Farmers Ins*., 892 F.2d 1434, 1441 (9th Cir. 1990) (applying Title VII discrimination case law to ADEA retaliation case).

To establish a prima facie case, the plaintiff must show that (1) he engaged in a protected activity; (2) he suffered an adverse employment decision; and (3) there was a causal link between the two. *Pardi*, 389 F.3d at 849; *Hashimoto*, 118 F.3d at 679; *see also O'Day v. McDonnell Douglas Helicopter Co*., 79 F.3d 756, 763 (9th Cir.1996) (ADEA retaliation claim).

The causation element may be inferred based on the proximity in time between the protected action and the retaliatory act; however, if the proximity in time is the only evidence to support plaintiff's retaliatory act, it must be "very

**ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT** ~ 21

close" in time. *See Yartzoff v. Thomas*, 809 F.2d 1371, 1376 (9th Cir. 1987).

Here, Plaintiffs have not established a prima facie case of retaliation based on the filing of an EEOC claim. Notably, Plaintiff filed his EEOC charge three days after receiving a final warning. Additionally, he was not terminated until six months after he filed his EEOC claim. Plaintiffs have failed to present any evidence that Defendant terminated Mr. Jones because he requested accommodations for his hearing loss. He requested accommodations as early as June 2018, and he was not terminated until April 2019. Additionally, Plaintiffs have failed to show that Defendant's reasons for terminating Mr. Jones were pretext for discriminating against him for filing the EEOC charge. As such, summary judgment on Plaintiffs' retaliations claims is appropriate.

### 6.    **Harassment claims**

While the Ninth Circuit generally treats Title VII and ADEA harassment or hostile work environment claims under the framework as set forth in the U.S. Supreme Court decisions of *Burlington Indus. Inc. v. Ellerth*, 524 U.S. 742 (1998), and *Faragher v. City of Boca Raton*, 524 U.S. 775 (1998), it has yet to rule whether a hostile work environment is cognizable under the ADA. *See Meirhofer v. Smith's Food and Drug Centers, Inc.*, 2011 WL 642664 (9th Cir. 2011).

To the extent Plaintiffs are bringing a harassment or hostile work environment claim under Title VII or the ADEA, summary judgment is appropriate on that claim. Plaintiffs have not shown that Mr. Jones was subjected to insults, jokes or verbal conduct that were based on his gender or age. Plaintiffs have identified five categories of harassing behavior they believe support their harassment or hostile work environment claims based on Mr. Jones's disability. Assuming that hostile work environment claims are cognizable under the ADA, these instances do not rise to the level of a "discriminatory hostile or abusive environment." *See id.* at *1 ("At most, derogatory nickname and occasional insulting comments constituted 'simple teasing' and 'isolated incidents' and were

**ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT** ~ 22

not sufficiently severe or pervasive to alter the terms and conditions of his employment and create an abusive work environment," citing *Faragher*, 524 U.S. at 788). As such, summary judgment on Plaintiffs' harassment/hostile work environment claims is appropriate.

Accordingly, **IT IS HEREBY ORDERED:**

1.     Defendant's Motion for Summary Judgment, ECF No. 107, is **GRANTED**.

2.     The District Court Executive is directed to enter judgment in favor of Defendant and against Plaintiffs.

**IT IS SO ORDERED**. The District Court Executive is hereby directed to file this Order, provide copies to counsel, and **close** the file.

**DATED** this 15th day of June 2021.



Stanley A. Bastian
Chief United States District Judge

**ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT** ~ 23